AMOS A. AND BETTIE E. LAMAR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Lamar v. Commissioner
Docket No. 3892-71.
United States Tax Court
T.C. Memo 1976-226; 1976 Tax Ct. Memo LEXIS 178; 35 T.C.M. (CCH) 993; T.C.M. (RIA) 760226; July 20, 1976, Filed Amos A. Lamar, pro se. [1]
*179 Richard D. Hall, Jr., and Frederick T. Carney, for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Chief Judge: This case was assigned to and heard by Special Trial Judge Randolph F. Caldwell, Jr., pursuant to Rules 180 and 182, Tax Court Rules of Practice and Procedure. His report was filed on April 14, 1976, and subsequently the petitioners filed exceptions to his report. The exceptions have been considered and are rejected. Accordingly, the Court agrees with and adopts the report which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE CALDWELL, Special Trial Judge: This case is one of a group of 37 which were consolidated for trial, but not for opinion. At the trial, evidence was received which bears upon every case in the group. Such evidence relates to certain contractual arrangements between the husband-petitioners' employers, Lockheed Aircraft Service Company (hereinafter, "Lockheed") and Dynalectron Corporation (hereinafter, "Dynalectron"), and the United States Air Force, as well as the employment arrangements between field team members (such as the husband-petitioners) and such employers. Respondent *180 determined deficiencies in petitioners' 1968 and 1969 Federal income taxes in the respective amounts of $848.99 and $931.16, and an addition to tax under section 6651(a) for late filing of the return for 1969. The principal issue for decision is whether all or any portion of the per diem payments received by petitioner Amos Lamar (hereinafter, "petitioner") from Lockheed in the period of June 1969 through December 1969 is includible in his gross income for such years under section 61(a)(1) of the Internal Revenue Code of 1954. [2] Respondent has conceded on brief that the per diem received by petitioner in 1968 and during January through May 1969 is not taxable to him. If such portion of the per diem payments is includible in petitioner's gross income is petitioner entitled to deduct an amount equal to all or any portion of the includible per diem payments, as away-from-home traveling expenses under section 162(a)(2)? The other issue is whether petitioner is liable for the addition to tax for 1969. FINDINGS OF FACT Petitioners filed their 1968 and 1969 *181 Federal income tax returns with the Internal Revenue Service Center servicing the district of Texas. They resided in Schertz, Texas, at the time they filed their petition in the present case. During both of the taxable years involved, petitioner was employed by Lockheed as a field team supervisor. That company, as well as Dynalectron, had a contract with the United States Air Force in each of the taxable years to provide field team services for the maintenance and modification of weapons systems (i.e., aircraft) and/or support equipment. These contracts were called "basic contracts" and the Air Force entered into such a contract with each of three different contractors. The contracts were for three years maximum duration, and those involved here were for the three fiscal years, July 1, 1967-June 30, 1968; July 1, 1968-June 30, 1969; July 1, 1969-June 30, 1970. The contract was firm for the first of the three years; but the Air Force had the unilateral right to extend the contract for the second and third years of the three-year period. The contracts were so extended by the Air Force insofar as both Lockheed and Dynalectron were concerned. (The record herein does not identify *182 the third contractor who had the basic contract.) The basic contract did not, of itself, award any work to be performed thereunder. It did specify the wage rates which would be paid for services rendered by employees of the contractor, if the contractor got work to be performed under the contract. The contract also contained the following provisions relating to the payment of per diem: (ii) Per Diem, not to exceed the applicable amounts set out below, when actually paid by the Contractor and approved by the Administrative Contracting Officer, shall be reimbursed to the Contractor, without regard to the duration of the assignment; provided, however, that no per diem shall be authorized or paid to any employee whose actual residence is within 50 miles of the work station to which the employee is assigned, nor shall any per diem be paid to any employee who actually resides at and commutes from his actual residence during the period of his employment, regardless of the distance between said residence and his assigned work station: (See (ii)(e) below).
(a) In the CONUS (No quarters and messing facilities furnished by the Government)-- $11.00-Per day per man for Engineer and Leadman *183 and $9.00-Per day per man for the remainder.
* * * * *
(e) For the purpose of this contract the term "actual residence" is defined as the fixed or permanent domicile of an employee. The employee shall certify to the location of his fixed or permanent domicile and this location, if accepted by the Contractor, shall be deemed, for the purpose of this contract, to be the employee's domicile in so far as per diem authorization against this contract is concerned. However, this does not relieve the Contractor of his responsibility to ascertain that the certification is valid. The opportunity for the contractor to perform under the basic contract arose from the issuance by the Air Force of a work order thereunder. Issuance of a work order was entirely within the discretion of the Air Force, and it alone had the discretion to select which one of the three holders of a basic contract that was to perform the work order. Performance under a work order might be at any place in the United States or at any place overseas where the Air Force maintained a base. Under the terms of the basic contract, work orders could only be issued during a given year of a basic contract. However, completion *184 of a work order actually issued during such year might be effected after the end of the year. When the Air Force had determined to issue a work order and had notified a contractor of its selection to perform that order, representatives of the Air Force and of the contractor would get together at a "pre-dock" meeting where the time for completion of the contract and the make-up of the contractor's projected field team complement would be worked out. Determination of the time of performance entailed fixing an input-output schedule -- the schedule which showed the number of units coming into the contractor for its maintenance and modification services per day or week or month, and the number of units to be completed by the contractor per day or week or month. After the projected field team complement had been worked out, the contractor would then proceed to get the team together. In assembling the team, the contractor would utilize two sources of manpower: (1) existing employees which it transferred from jobs under other work orders; and (2) new employees which it recruited. Whenever a contractor hired a new employee for field team work, that employee was advised that he was *185 subject to being sent anywhere that the contractor might be called upon to perform a work order, and that if the employee was unwilling to travel where thus directed to go, his only alternative was to resign. The employee was also advised that the contractor only had a basic contract for a year and that it had no way of knowing whether or when it would receive work orders under that contract. It was also made clear to the employee that, while the contractor would endeavor to continue to utilize the services of the employee after completion of the work order in connection with which he was hired, it could not guarantee any such further employment; and if none were available, the employee would be laid off. Neither Lockheed nor Dynalectron maintained any pool or central area where an employee who had completed an assignment could be sent pending the contractor getting another work order on which such employee could be used. Both Lockheed and Dynalectron were involved in the performance of work orders at Key Field in Meridian, Mississippi, during the years involved. [3]Lockheed had first come to Meridian in 1965 and it remained there until June 30, 1969, at which time (although *186 it did not lose its status as holder of one of the three basic contracts) it was supplanted by Dynalectron. During the fiscal year ended June 30, 1969, Lockheed received two work orders to be performed at Meridian; and during the succeeding fiscal year, Dynalectron likewise received two work orders. While in most instances, the contractor's field teams were sent to the location where the aircraft were located, in the case of the work orders performed at Meridian, the aircraft were brought by the Air Force to that work site from other locations. During the performance of a work order, the Air Force always had an on-site representative, monitoring the performance of the contractor. One of the areas of concern was to determine whether the field team was over strength or under strength, as well as the quality of work of the field team members. Instances occurred when the composition of the field team was changed as the result of the recommendation *187 of the Air Force's on-site representative. For this reason, as well as for the reason that the composition of the field team varied according to the nearness in point of time to the beginning or the end of the performance under the work order, the projected field team complement as worked out at the pre-dock meeting might vary as much as 10 to 20 percent during the performance of the contract. When an employee was hired, or rehired, by a contractor, he was required to certify to the contractor his "permanent or domicile" address (in the case of Lockheed) or his "fixed or permanent domicile" (in the case of Dynalectron). If the address so certified was further than 50 miles from the job site where the employee was to work and if the employee did not drive back and forth to work, irrespective of the address which he had furnished, he was paid the per diem mentioned and described above. The per diem payments made by the contractors were included in their invoices to the Air Force, solely for the purpose of being reimbursed. There was no element of profit to the contractors in the per diem for which they sought reimbursement. Per diem paid to the field team employees who qualified *188 therefor was at the rate of $11 per day for a leadman and an engineer, and $9 per day for the other members of the field teams. Per diem was paid for seven days per week, although the regular work week for field team members was a 5-day, 40-hour week. Field team members also received per diem during their initial travel to a work site, for days of travel when transferred to different work sites, and for a maximum of three days for return to their homes, in the event they were laid off. They did not receive per diem during vacation periods; but they did receive per diem for three days up to a maximum of six days if they were sick. Neither Lockheed nor Dynalectron withheld Federal income tax from the per diem payments made to their employees. From about 1962 up until June 30, 1969, petitioner and Mrs. Lamar owned a house in Schertz, Guadalupe County, Texas. Schertz is about 18 miles northeast of San Antonio. From and after 1965 their house was on Fawn Drive. During petitioner's Lockheed assignments up until he was assigned to Key Field in Meridian toward the end of September 1968, petitioner (when he was in town), Mrs. Lamar, and their daughter lived in the Fawn Drive house. *189 Petitioner tired of the high cost of maintaining two homes (the Fawn Drive house and the home for himself at whatever place he happened to be assigned); and he was also dissatisfied because he was so infrequently in Schertz to take care of the Fawn Drive house. When he came to Meridian he determined to bring Mrs. Lamar and their daughter to that city to live with him. Mrs. Lamar resigned a civil service position she had near Schertz, and she and the daughter came to Meridian during the last week of November or the first week of December 1968. They closed the house in Schertz and finally sold it on June 30, 1969. At the time of the sale, some of the furnishings were sold with the house and the remainder were stored with a storage and transfer company in San Antonio, where they remained for the balance of the year 1969. Petitioner and Mrs. Lamar rented an apartment in Meridian and they and their daughter (up until her marriage at an unspecified date in 1969) lived there for the duration of petitioner's Meridian assignment on or about August 28, 1969. Following a three-week vacation subsequent to the Merdidian assignment, petitioner was assigned by Lockheed to Abilene, Texas, on *190 September 19, 1969; and he remained there for the remainder of that year. Mrs. Lamar came to Abilene with petitioner and they rented an apartment there. Mrs. Lamar was with petitioner throughout the remainder of the year with the exception of a two-week period in October when she went to visit her parents in Bartlesville, Oklahoma. Throughout 1968 and 1969, petitioner maintained his banking connections with a bank near Schertz. He kept Texas license plates on his automobiles up until the summer of 1969 when he purchased an automobile in Mississippi. He was unable to make arrangements for Texas license plates for his new car and was compelled to purchase Mississippi plates. Petitioner advised Lockheed on January 20, 1966, that his "domicile town and state" was Schertz, Texas. He did not change that advice during the taxable years here involved. Petitioner received per diem payments from Lockheed of $3,159 and $3,861 during 1968 and 1969, respectively, none of which did he include in gross income on his returns for those years. In his statutory notice of deficiency, respondent included such amounts in petitioner's gross income for years in which they were received, under *191 section 61. Petitioner's 1969 return was due to be filed on or before April 15, 1970. From March 12, 1970, to April 30, 1970, petitioner was in Guam, and from May 2, 1970 to May 9, 1970, he was in Spain. He wrote to his wife and asked her to obtain an extension of time to file their 1969 return, and from information which he received back from her he believed that he did have an extension of either 60 or 90 days after he returned to the United States. He returned to Abilene on May 12, 1970, and the return was filed on June 15, 1970. Respondent determined that petitioners were liable for an addition to tax under section 6651(a) for 1969 in the amount of $88.42, for late filing of their return for that year. OPINION At the outset, it is noted that respondent has conceded on brief that the per diem payments received by petitioner for 1968 and for the first five months, i.e., through May 1969, did not result in taxable income to petitioner. That concession is predicated on the maintenance of two places of abode by petitioner for the periods mentioned. The evidence establishes, however, that the same conditions that prevailed for the months of January through May of 1969 *192 obtained also for the month of June, that is until the Fawn Drive house was sold on June 30, 1969. It should be held, then, that the per diem payments for 1968 and for the first six months of 1969 did not result in taxable income to petitioner. It must now be determined whether the per diem payments received by petitioner during the last six months of 1969 are includible in petitioner's gross income for that year. It is believed that they are. In very broad language, section 61(a)(1) provides that "gross income" means "all income from whatever source derived." The Supreme Court has construed this "broad phraseology" to evince a Congressional intention "to tax all gains except those specifically exempted." Commissioner v. Glenshaw Glass Co.,348 U.S. 426, 430. The per diem payments were "undeniable accessions to wealth, clearly realized and over which the [petitioner had] complete dominion" ( Commissioner v. Glenshaw Glass Co.,supra, p. 431); and thus they were gains. There is no Code provision exempting per diem payments from taxation. Manifestly, then, the respondent was correct in including in petitioner's 1969 gross income the per *193 diem payments which he received from Lockheed during the last six months of that year. Leo C. Cockrell,38 T.C. 470, 477-478, affd. (8th Cir.) 321 F.2d 504; Darrell Spear Courtney,32 T.C. 334, 341. [4]
The question remains whether petitioner is entitled to deduct for 1969 under section 162(a)(2) an amount equal to all or any part of the includible per diem, as expenses of travel while away from home in pursuit of his trade or business as an employee of Lockheed, Leo C. Cockrell,supra, p. 479. In the Cockrell case, it was pointed out that the Supreme Court in Commissioner v. Flowers,326 U.S. 465, rehearing denied 326 U.S. 812, had laid down three requirements that a taxpayer must meet to be entitled to deduct away-from-home expenses: The expenses must be (1) reasonable and necessary traveling expenses, (2) incurred by the taxpayer while away from home, and (3) incurred in pursuit of business. In the present case, the parties differ only on the point of whether petitioner was away from home. In the case *194 of Truman C. Tucker,55 T.C. 783, 786, the factors to be considered in determining whether a taxpayer should be treated as away from home for tax purposes were crystallized.It was there said: The purpose of allowing the deduction of living expenses while a taxpayer is "away from home" is "to mitigate the burden of the taxpayer who, because of the exigencies of his trade or business, must maintain two places of abode and thereby incur additional and duplicate living expenses." Ronald D. Kroll,49 T.C. 557, 562 (1968). In furtherance of this purpose, when a taxpayer with a principal place of employment goes elsewhere to take work which is merely temporary, he may deduct the living expenses incurred at the temporary post of duty, because it would not be reasonable to expect him to move his residence under such circumstances. Emil J. Michaels,53 T.C. 269 (1969); Ronald D. Kroll,supra.For this purpose, temporary employment is the type which can be expected to last for only a short period of time. Beatrice H. Albert,13 T.C. 129, 131 (1949). Two points are thus presented: Were petitioner's *195 assignments during the last six months of 1969 temporary, as opposed to indefinite? And, did he maintain two places of abode while on those assignments, and thereby incur duplicate and additional living expenses? With respect to the first point, respondent has conceded on brief that all of petitioner's assignments in 1968 and 1969 were temporary. That leaves only the question of whether he maintained two places of abode while he was at Meridian in July and August and while he was in Abilene during September, October, November, and December of 1969. It is believed that he did not. During those assignments he and Mrs. Lamar and their daughter (until her remarriage) all lived together in the respective cities where petitioner was assigned. It was in those cities, and no where else, that petitioner incurred living expenses, and thus there were no additional and duplicate expenses, mitigation of the burden of which the deductions afforded by section 162(a)(2) is designed to effect. Indeed, petitioner testified that he decided to sell the Fawn Drive house in Schertz precisely because he had become tired of maintaining two places of abode. Of course, Mrs. Lamar's visit to her parents *196 in October 1969 did not amount to the maintenance of a second place of abode by petitioner. Thus, petitioner was at, not away from, home for tax purposes on his assignments during the last six months of 1969. On this first and principal issue, there should be included in petitioner's 1969 gross income the per diem payments he received from Lockheed during the period of July through December of 1969. He received per diem as a supervisor, at the rate of $11 per day. The evidence reveals that he was at Meridian for 31 days in July and 28 days in August. He was at Abilene 12 days in September, and throughout the three-month period of October through December. The parties can compute the exact amount of the includible per diem. It would appear to be $1,782. He is not entitled to deduct any amount under section 162(a)(2), as away-from-home traveling expenses. On the second issue, it is believed that petitioner had reasonable cause for the late filing of his 1969 return. No addition to tax under section 6651(a) should be imposed. * * * * *
In accordance with the foregoing, Decision will be entered under Rule 155. Footnotes
1. DeQuincy V. Sutton was counsel of record for petitioners at the time of trial. Mr. Sutton died in August 1974, shortly after the last brief was filed. There is presently no counsel of record for petitioners.↩
2. All section references are to the Internal Revenue Code of 1954, unless otherwise specified.↩
3. The petitioner-husband in the present case, as well as all the other husband-petitioners, worked at Key Field in Meridian. It is this work at Meridian that is the common element that prompted the consolidation of the cases for trial.↩
4. See also Fred W. Phillips,T.C. Memo. 1973-58↩.